**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: ABBOTT LABORATORIES, et al., | ) | |
| PRETERM INFANT NUTRITION PRODUCTS | ) | MDL No. 3026 |
| LIABILITY LITIGATION | ) | |
| _____ | ) | Master Docket No. 22 C 71 |
| | ) | |
| This Document Relates To: | ) | |
| | ) | |
| R.J., a minor, by his next of friend, | ) | |
| Rebecca Donaldson, and Rebecca | ) | |
| Donaldson, individually, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 22 C 2011 |
| | ) | |
| MEAD JOHNSON & COMPANY, LLC, | ) | Judge Rebecca R. Pallmeyer |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case is one of hundreds consolidated by the Judicial Panel on Multidistrict Litigation ("JPML") and pending before this court, in which plaintiffs have alleged that infant formula manufactured by defendants caused necrotizing enterocolitis ("NEC") in babies born prematurely. Plaintiff Rebecca Donaldson and Donaldson's minor child, R.J., filed this case in the Western District of Missouri against one of the manufacturers, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company; the parties are of diverse citizenship. Earlier this year, the court issued a Memorandum Opinion and Order [26], concluding that Mead Johnson was subject to general jurisdiction in Missouri by virtue of that state's corporate registration statute. Mead Johnson has moved for reconsideration of that aspect of the court's ruling and, for the reasons noted here, the court grants that motion and vacates Section I of its prior order. Because no other basis exists for the Missouri district court to exercise personal jurisdiction over Mead Johnson, the court dismisses this action without prejudice to refiling in Kansas or, if the parties agree, directly in this court.

## BACKGROUND

### I.     Factual Background

The court reviewed the facts in its earlier opinion but revisits them here. Plaintiff Rebecca Donaldson, a resident of Missouri, gave birth to her son, R.J., at Overland Hospital ("Overland"), in Overland Park, Kansas, on February 20, 2010. (Pl.'s First Am. Compl. ("Am. Compl.") [14] ¶ 34.) Overland is less than ten miles from the Missouri border. (*Id.* ¶¶ 7–8, 34.) R.J. was premature, arriving at 31 weeks' gestational age; he weighed only 1540 grams (just under three and a half pounds). (*Id.* ¶ 34.) After a week in Overland's NICU, doctors started R.J. on "low-volume feeds by mouth" of Mead Johnson's infant formula, Enfamil Premature Infant Formula 24 Calories with Iron. (*Id.* ¶¶ 9, 35.)

By March 5, R.J. began exhibiting serious symptoms of NEC, including "distended loops of bowel and bloody stool" and gas building up within his intestinal walls. Doctors diagnosed R.J. as suffering from NEC, stopped feeding him Enfamil, and started him on antibiotics. (*Id.* ¶ 36.) On March 7, R.J. was transported from Overland Hospital to the University of Kansas Medical Center, where he stayed for months, undergoing numerous surgeries—including three "exploratory laparotom[ies]"—to remove large swaths of necrotized bowel tissue from his gastrointestinal tract. (*Id.* ¶¶ 37–40.) Every day during that period, R.J.'s mother drove the fifteen-minute trip from her Missouri home to see him. (*Id.* ¶ 40.) He was finally released from the hospital on June 12, 2010, 112 days after his premature birth, and has "continually resided in Missouri" since then, undergoing treatment in Kansas City, Missouri to the present day to confront a devastating host of symptoms, including "constant diarrhea" and "short gut syndrome." (*Id.* ¶¶ 40–41.)

Mead Johnson manufactures and distributes Enfamil, its infant formula, in every state, including Missouri. (*Id.* ¶ 9.) Mead Johnson is incorporated in Delaware and its principal place

of business "has been located in Illinois and/or Indiana,"[1] but it also "registered [to do business] with the Missouri Secretary of State" in February of 2010 and December of 2012.  (*Id.* ¶¶ 9–10.) From 2008 until 2020, Mead "held an exclusive contract" in Missouri for the "Special Supplemental Nutrition Program for Women, Infants, and Children" ("WIC"), a federal program providing nutritional assistance and social services to low-income mothers and others.  Sales pursuant to that contract formed "an important part of [Mead's] U.S. Business . . . ."  (*Id.* (quoting Form S-1 Registration Statement Under the Securities Act of 1933: Mead Johnson Nutrition Company (2008), https://www.sec.gov/Archives/edgar/data/1444904/000119312508196083/ds1.htm.) According to Plaintiffs, Mead also employs "numerous key opinion leaders and employees" in Missouri, at least some of whom "engage in significant outreach" from Missouri to Kansas City doctors.  (Am. Compl. ¶ 11.)  Plaintiffs further allege that Mead maintains "investigator sites" related to its formula in Missouri, and that its parent company "maintains a logistical center" in St. Peters, Missouri.[2]  (*Id.*)  Finally, Plaintiffs allege that Mead's misleading marketing led Ms. Donaldson to "belie[ve] that Defendant's products were safe for Baby R.J.," and that "R.J.'s Mother and physicians would not have fed Baby R.J. Defendants' Cow's Milk-Based Products if she/they had known of the extreme risk to her child" they posed.  (*Id.* ¶¶ 29–32.)

## II.    Procedural Background

More than a decade after R.J.'s birth, on March 4, 2022, Plaintiffs sued Mead Johnson in the Western District of Missouri, alleging that ingesting Mead's cow's-milk-based infant formula or infant milk fortifiers made from cow's milk caused R.J.'s NEC.  (Compl. [1] at 1–2.)  On January 31, 2023, Mead Johnson moved to dismiss Plaintiffs' claim on multiple grounds.  First, Mead

---

[1]    Mead clarifies that its current principal place of business is in Evansville, Indiana. (Def. Mead Johnson & Co., LLC and Mead Johnson Nutricion Co.'s Mem. in Supp. of their Mot. to Dismiss Pl.'s First Am. Compl. (hereinafter "Defs.' MTD") [17] at 4.)

[2]    Mead speculates that Plaintiffs are referring to Mead's current parent company, Reckitt Benckiser, which has a distribution center in Missouri, and points out that Reckitt Benckiser did not become Mead's parent company until 2017, about seven years after R.J.'s birth. (Defs.' MTD at 10.)

argued that the Western District of Missouri lacked personal jurisdiction over Mead and is an improper venue. In the alternative, Mead sought transfer of venue to the District of Kansas under 28 U.S.C. § 1406(a). Finally, Mead moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs' claims were time-barred and alleged certain product liability claims unavailable under Kansas law. (*See generally* Defs.' Mem. in Supp. of Mot. to Dismiss [11].) A month later, Plaintiffs filed the Amended Complaint at issue here, including additional details, described above, concerning Mead's conduct and connections with Missouri.

A. **Mead Johnson's Motion to Dismiss**

In March 2023, Mead moved to dismiss Plaintiffs' Amended Complaint, arguing, as it had earlier, that Missouri could not exercise personal jurisdiction over Mead, that venue was improper, that Plaintiffs' claims were time-barred by Kansas law, and that two of Plaintiffs' three product liability claims must be dismissed because they are not recognized under Kansas law. (*See generally* Defs.' MTD.)

Then, in June 2023, while that motion was pending, the U.S. Supreme Court decided *Mallory v. Norfolk Southern Railroad Co.*, 600 U.S. 122, 143 S. Ct. 2028 (2023). In *Mallory*, the Court upheld the constitutionality of a Pennsylvania statute that conditioned doing business in the state on consenting to general personal jurisdiction in its courts. Mead Johnson promptly filed a notice of supplemental authority, notifying the court of the *Mallory* decision but arguing that the opinion "has no application here," because, as Mead Johnson reads Missouri's corporate registration statute, it differs from Pennsylvania's law and "does not subject foreign corporations to general personal jurisdiction simply by registering to do business." (Def. Mead Johnson & Co., LLC and Mead Johnson Nutrition Co.'s Notice of Suppl. Authority [24] at 1 (citing *State ex rel. Norfolk S. Ry. Co. v. Dolan*, 512 S.W.3d 41, 52 (Mo. 2017) (en banc).) Plaintiffs responded, arguing briefly that *Mallory* is, in fact, relevant to the personal jurisdiction question in this case. Plaintiffs contended that *Mallory* undermined *Norfolk Southern v. Dolan*, a 2017 opinion in which the Missouri Supreme Court held, *en banc*, that Missouri's registration statute does not confer

general jurisdiction on foreign corporations. (Pl.'s Resp. to Defs. Mead Johnson & Co., LLC & Mead Johnson Nutrition Co.'s Notice of Suppl. Authority [25] at 2.)

> **B.      The Court's August 3, 2023 Memorandum Opinion and Order**

On August 3, 2023, this court issued a Memorandum Opinion and Order "dismiss[ing] Plaintiffs' complaint" but retaining jurisdiction over the suit itself. (*See* Mem. Op. and Ord. [26].)

First, the court denied Defendants' motion to dismiss the suit under Rule 12(b)(2) of the Federal Rules of Civil Procedure, finding that Missouri's statutory scheme conferred general jurisdiction over them. (*Id.* at 4–7.) The court noted that *Mallory* upheld *Pennsylvania Fire Insurance Co. of Philadelphia v. Gold Issue Mining & Milling Co.*, 243 U.S. 93 (1917), decided more than a century earlier. In *Pennsylvania Fire*, the Court held that Missouri's then-existing corporate registration regime, which conferred general jurisdiction over foreign insurance corporations doing business in the state, did not violate the Due Process Clause of the Fourteenth Amendment.[3] (Mem. Op. and Ord. at 6 (citing *Mallory*, 143 S. Ct. at 2036–37).) In ruling on Mead's motion to dismiss this case, then, this court turned to Missouri's present-day statutory scheme and, comparing it with the Pennsylvania statute at issue in *Mallory*, concluded that it "requires foreign corporations like Mead Johnson to consent to suit in its courts." (*Id.* at 6.) Because *Mallory* held such statutes to satisfy due process, the court concluded that Missouri could exercise general jurisdiction over Mead.

In rejecting Mead Johnson's arguments to the contrary, the court recognized that in *Dolan*, the Missouri Supreme Court held that Missouri's corporate registration statute does *not* subject foreign corporations to general jurisdiction. This court understood *Dolan* as being informed by a sense that the old *Pennsylvania Fire* case "'should no longer be followed'"; the court reasoned

---

[3]      Coincidentally (and confusingly), *Pennsylvania Fire* concerned a Missouri statute which at that time was assumed to subject foreign corporations to general jurisdiction; contrarily, *Mallory* dealt with a Pennsylvania corporate-registration statute that indisputably subjected foreign corporations to general jurisdiction there.

that in upholding *Pennsylvania Fire*, *Mallory* undermined *Dolan*'s holding. (*Id.* at 7 (quoting *Dolan*, 512 S.W.3d at 53 n.11).)

The court agreed with Mead, however, that the Western District of Missouri is an improper venue, and therefore granted Defendant's motion to dismiss under Rule 12(b)(3) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1406(a). The venue statute, 28 U.S.C. § 1391(b), generally limits proper venue to the federal district (1) where the defendant resides, or (2) where a substantial part of the events giving rise to the claim occurred. Neither of those tests are met here, the court concluded, because "Mead Johnson does not reside in Missouri" and "R.J. was born in Kansas, was fed Mead Johnson's allegedly injurious product in Kansas, and was diagnosed with NEC in Kansas." (Mem. Op. and Ord. at 7–8.) Finally, the court noted that remedy procedures available to an MDL transferee court are limited, and therefore directed the parties to meet and confer to discuss procedural next steps. (*Id.* at 8–9.)

## C.    Mead Johnson's Reconsideration Motion

Mead Johnson moves for reconsideration of this court's ruling as to personal jurisdiction. (Defs. Mead Johnson & Co., LLC, and Mead Johnson Nutrition Co.'s Mot. for Partial Reconsideration (hereinafter "Reconsideration Motion") [29].) Mead contends that "the Court's (incorrect) ruling on personal jurisdiction could materially impact the administration of the MDL and the rights of the parties, especially following remand, and create confusion about which States have jurisdiction over which defendants and for which plaintiffs' claims." (*Id.* at 1.) Second, Mead observed that because the court had found venue improper, there was no need to address the issue of personal jurisdiction at all. (*Id.*) Finally, on the merits, Mead argued that the court incorrectly read the Missouri Supreme Court's decision in *Dolan* as conflicting with *Mallory*. The two cases are in fact consistent, Mead contends, in that *Mallory* held that a state *may* constitutionally subject foreign corporations to general jurisdiction through a registration statute, while *Dolan* held that Missouri's *own* registration statute does no such thing. (*Id.* at 1–2.)

6

### D.    Briefing on Next Steps

While that reconsideration motion was pending, at the court's direction, the parties "conferred both via phone conference and via email" as to the appropriate next steps. (Pl.'s Br. Addressing Appropriate Next Steps [33] at 1.) Those discussions did not result in agreement. (*Id.* at 1–2.) Plaintiffs suggested that this case be removed from the bellwether pool and that "no further work-up or motion practice occur[] until such time as the case is remanded to the Transferor Court," presumably after pretrial discovery. (*Id.* at 2.)

Because Mead believes the outcome of this reconsideration motion will alter procedural options, Mead urges that the court rule on the motion before deciding on next steps. (Defs. Mead Johnson & Co., LLC, and Mead Johnson Nutrition Co.'s Brief Regarding Procedural Next Steps [34] at 2–3.) If the court reverses itself and finds personal jurisdiction lacking in Missouri, for example, Defendants believe that it could transfer the case on its own to Kansas—rather than relying on the JPML—under 28 U.S.C. § 1631. (*Id.* at 2–3 (citing *In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. & Prod. Liab. Litig.*, 288 F. Supp. 3d 1087, 1215–17, 1217 n.39 (D.N.M. 2017).) Alternatively, Mead argued, if the court stands by its earlier decision that Missouri courts have jurisdiction over Mead, the court could dismiss the case under 28 U.S.C. § 1406(a). (Defs. Mead Johnson & Co., LLC, and Mead Johnson Nutrition Co.'s Brief Regarding Procedural Next Steps at 3–4.) In that event, Mead Johnson suggested that Plaintiffs could refile the complaint either in Kansas or directly here in the MDL court. Defendants pointed out that such a result would not generate a concern about the timeliness of the filing because Kansas' saving statute allows a case that has been dismissed for a reason other than the merits to be refiled within 6 months of the dismissal, notwithstanding that the statute of limitations has expired. (*Id.* at 4, citing Kan. Stat. Ann. § 60-518.)

In a September 1, 2023 ruling, the court stayed further motion practice pending a decision on Defendants' motion for partial reconsideration. (Minute Entry [35].) The court agreed that bellwether trial treatment may be inappropriate, but also observed that, assuming the case "will

proceed in at least some venue," case-specific discovery should continue notwithstanding "the uncertainty of the ultimate trial venue." (*Id.*)

**DISCUSSION**

Under Rule 54(b) of the Federal Rules of Civil Procedure, "non-final orders 'may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.'" *Galvan v. Norberg*, 678 F.3d 581, 587 (7th Cir. 2012) (quoting FED. R. CIV. P. 54(b)). This Rule "bestow[s] sweeping authority upon the district court to reconsider" its interlocutory orders. *Galvan*, 678 F.3d at 587 n.3; *see also Sims v. EGA Prods., Inc.*, 475 F.3d 865, 870 (7th Cir. 2007) (Cudahy, J., concurring) (noting that "nonfinal orders are generally modifiable"). Reconsideration is appropriate for "correcting manifest errors of law or fact, or for presenting newly discovered evidence." *Leibas v. Dart*, No. 19 CV 7592, 2022 WL 17752389, at *5 (N.D. Ill. Dec. 19, 2022) (Pallmeyer, J.), *appeal filed*, No. 23-1275 (7th Cir. Feb. 14, 2023).

## I.     Consent to General Jurisdiction Under Missouri's Corporate Registration Statute

"[E]xpress or implied consent" can subject a defendant to general personal jurisdiction in a state's courts, allowing them to be haled into court there on any claim. *Mallory*, 600 U.S. at 138 (quoting *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982)). Pennsylvania's corporate registration statute, whose constitutionality was at stake in *Mallory*, does just that: it explicitly "provide[s] that 'qualification as a foreign corporation' [i]s a 'sufficient basis' for Pennsylvania courts 'to exercise personal jurisdiction' over an out-of-state company." *Mallory*, 600 U.S. at 151 (Alito, J., concurring) (quoting 42 Pa. Cons. Stat. § 5301(a)(2)(i)). In other words, compliance with Pennsylvania's foreign corporation registration scheme expressly constitutes consent to general jurisdiction. *Id.* at 127. The question here is whether Missouri's corporate registration statute does the same thing as Pennsylvania's, rendering out-of-state corporations subject to any claims in Missouri simply for doing business there.

Under Missouri's statute, before an out-of-state corporation can conduct business in Missouri it must receive a "certificate of authority" from Missouri's secretary of state. Mo. Ann. Stat. § 351.572. As part of that process, the company must appoint an agent there for service of process. *Dolan*, 512 S.W.3d at 51 (citing Mo. Ann. Stat. §§ 506.160.1(3), 531.594.1). The effect of that certificate of authority is to grant the foreign corporation "the same but no greater rights and . . . the same but no greater privileges" as domestic corporations, and to subject foreign corporations to "the same duties, restrictions, penalties, and liabilities now or later imposed on" domestic ones. Mo. Ann. Stat. § 351.582.

In its earlier order, this court concluded that Missouri's requirement for appointing an agent for process and its language concerning the rights and privileges of foreign corporations implied consent to general jurisdiction. (*See* Mem. Op. and Ord. at 4–7.) The court also held that *Dolan*, in which the Missouri Supreme Court held that Missouri's corporate registration statutes did *not* subject foreign corporations to general jurisdiction, 512 S.W.3d at 52–53, was not controlling. (Mem. Op. and Ord. at 7.) But with the benefit of further briefing, the court concludes this was in error.

In *Dolan*, the Missouri Supreme Court held that Missouri's "registration statute does not provide an independent basis for broadening Missouri's personal jurisdiction to include suits unrelated to the corporation's forum activities when the usual bases for general jurisdiction are not present." 512 S.W.3d at 52. As the state high court read Missouri's statute, it does not confer general jurisdiction on foreign corporations. To the extent some older Missouri and Supreme Court cases "suggest[ed] otherwise," the court stated, they should "no longer be followed" because "they go beyond the language of the relevant statutes . . . ." *Id.* at 52–53. The court considered *Pennsylvania Fire*, where the U.S. Supreme Court found no constitutional bar to conditioning corporate registration on consent to general jurisdiction. But in so holding, the Missouri Supreme Court stated, *Pennsylvania Fire* "simply accepted Missouri's interpretation of its own statute as allowing such broad jurisdiction over foreign insurers, without independently

9

Case: 1:22-cv-02011 Document #: 40 Filed: 12/08/23 Page 10 of 21 PageID #:378

examining whether that statute actually made registration consent to general jurisdiction." *Id.* at 52 n.11. Importantly, the *Dolan* court also noted that Missouri has since *changed* its interpretation of the statute at issue in *Pennsylvania Fire*, such that it no longer subjects out-of-state insurers to general jurisdiction. *Id.* (citing *State ex rel. Am. Cent. Life Ins. Co. v. Landwehr*, 300 S.W. 294 (Mo. 1927) (en banc)). In other words, the Missouri Supreme Court suggested that *Pennsylvania Fire* should "no longer be followed," not because of doubts about its constitutionality, but rather because the 1917 decision rested on an outdated and incorrect interpretation of Missouri's corporate registration statutes. *See Dolan*, 512 S.W.3d at 52–53. In contrast, *Mallory* focused on the *constitutional* question *Pennsylvania Fire* had decided in 1917—whether, under Missouri's then-existing interpretation that its statute does subject foreign insurers to general jurisdiction, such a statute would survive constitutional challenge. *Mallory*, then, says nothing about the current interpretation of Missouri's corporate registration statutes.

It is outside the court's "province" to question the Missouri Supreme Court's own interpretation of Missouri law. *Helicopteros Nacionales v. Hall*, 466 U.S. 408, 413 n.7 (1984); *In re Emerald Casino, Inc.*, 867 F.3d 743, 765 (7th Cir. 2017) (noting that federal courts are "bound by the decisions of the state's highest court" when applying state law). Because, properly read, *Mallory* does not bear on *Dolan*, *Dolan*'s own interpretation of Missouri's statutes remains good law. Reconsideration is especially appropriate here, where the order's holding could be relevant to other Missouri litigants in this MDL.

Moreover, for several reasons, it makes sense to conclude that Missouri's statutory scheme reaches less broadly than Pennsylvania's. First, Missouri's statute does not explicitly mention general jurisdiction; Pennsylvania's does. *See* 42 Pa. Cons. Stat. § 5301(b) ("When jurisdiction over a person is based upon this section any cause of action may be asserted against him, whether or not arising from acts enumerated in this section."). Second, as *Dolan* pointed out, Missouri's long-arm statute "permits service on defendants for causes of action arising out of their activities in Missouri," but not beyond that, and section 351.594.1, which comprises part of

10

Missouri's corporate registration scheme, provides that a corporation's agent for service of process consents to service only for suits "required or permitted by law to be served on the foreign corporation." Mo. Ann. Stat. § 351.594.1. It is fair to read these two provisions together as limiting process on out-of-state corporate defendants to cases falling within Missouri's long-arm statute, which would be only those arising out of the corporation's activities within Missouri. *See Dolan*, 512 S.W.3d at 52 (making this point).

Finally, although this court is not bound by decisions of other district judges or state high courts besides Missouri's, those decisions provide useful guidance. At least two other courts have declined to interpret state statutes similar to Missouri's as subjecting corporations to general jurisdiction.[4] *See Lumen Techs. Serv. Grp. V. CEC Grp.*, __ F. Supp. 3d. __, No. 23-cv-00253-NYW-KAS, 2023 WL 5822503, at *6 (D. Colo. Sept. 8, 2023) (noting that, absent language like Pennsylvania's *explicitly* stating that registration comprised consent to general jurisdiction, Colorado's statute "cannot serve as a basis to find [Defendant's] implied consent to Colorado courts' personal jurisdiction"); *Chavez v. Bridgestone Americas Tire Ops., LLC*, 2022-NMSC-006, ¶¶ 47–52, 503 P. 3d 332 (same). The language of the Missouri law is considerably less explicit. The court concludes that *Dolan* remains the authoritative account of the scope of Missouri's corporate registration statute, and that *Mallory* does not change its holding. Accordingly, the court vacates Section One of its Memorandum Opinion and Order.

## II. Personal Jurisdiction Absent the Defendants' Consent

Consent is only one basis for finding a defendant subject to a state's personal jurisdiction. *See Mallory*, 600 U.S. at 138; *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 927–

---

[4]    Plaintiffs point out that *Dolan* never explicitly confronts the specific phrase in Missouri's scheme stating that foreign corporations are subject to "the same but no greater rights" and the same "duties, restrictions, penalties, and liabilities" as domestic ones. (Pl.'s Resp. to Defs.' Mot. for Reconsideration [36] at 4.) But though it never quotes this precise language, the opinion does cite to that part of the statute in defining the boundaries of the corporate registration scheme it is interpreting. *See Dolan*, 512 S.W.3d at 51 n.7. *Dolan*'s failure to explicitly analyze each phrase in the scheme whose scope it defined is not, in this court's view, a sufficient basis for a finding of jurisdiction in this case.

28 (2011) (noting that personal jurisdiction can also exist over a corporation "that has not consented to suit in the forum"). Due process does, however, "limit[] a state court's power to exercise jurisdiction over a [nonconsenting] defendant." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. __, 141 S. Ct. 1017, 1024 (2021). Whether the tribunal has such power depends on whether the defendant's contacts with the forum are such that "'maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945)). A defendant whose connections to a state are substantial enough may be subject to general jurisdiction there. *Goodyear*, 564 U.S. at 919. Contrarily, when a defendant is "less intimately connected with a State," the state may exercise specific jurisdiction over the defendant on "a narrower class of claims." *Ford*, 141 S. Ct. at 1024. The burden falls on the plaintiff to demonstrate that personal jurisdiction exists over the defendant. *In re Sheehan*, 48 F.4th 513, 520 (7th Cir. 2022). Having concluded that registration to do business in Missouri did not subject Mead to general jurisdiction, the court considers whether there is another basis for exercising jurisdiction over Mead, consistent with due process.[5]

### A.     General Jurisdiction

"Only a select 'set of affiliations with a forum' will expose a defendant" to general jurisdiction. *Ford*, 141 S. Ct. at 1024 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)). Paradigmatically, a defendant is subject to general jurisdiction where they are at home, which, for a corporation, consists of "its place of incorporation and principal place of business." *Id.* The

---

[5]      In their reconsideration motion, Defendants argue that as the court had found venue improper, it had no need to determine whether personal jurisdiction existed in Missouri. (*See* Reconsideration Motion at 9–10.) But a corporate defendant is deemed to reside anywhere it is subject to personal jurisdiction. 28 U.S.C. § 1391(c)(2) (defining corporate residency for venue purposes as "any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question"). Thus, if Missouri could exercise personal jurisdiction over Mead, venue may be proper there. The court therefore considers other bases for personal jurisdiction here; it did not do so in its prior order, but neither party surfaced the issue earlier, nor do Plaintiffs ask the court to reconsider its earlier venue ruling.

Supreme Court has also left open the possibility that, in an "exceptional case," a corporation could have such extensive contacts with a state as to render it "at home" there for purposes of exercising general jurisdiction, even if not incorporated or principally operating there. *Daimler*, 571 U.S. at 139 n.19.

Mead is incorporated in Delaware and its principal place of business is in Indiana. (Am. Compl. ¶ 9; Defs.' MTD at 4.) Plaintiffs do not contend that Mead's connections with Missouri are somehow substantial enough to constitute the exceptional case *Daimler* entertained in its footnote. (*See generally* Pl.'s Mem. Resp. in Supp. of their Opp. to Defs.' Mot. to Dismiss [21] at 7–12.) Accordingly, Mead is not subject to general jurisdiction in Missouri.

### B.      Specific Jurisdiction

Specific jurisdiction is governed by both constitutional standards and states' long-arm statutes. *See, e.g., Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 487 (1985) (finding that application of Florida long-arm statute to exercise jurisdiction over defendant "did not offend due process"). Often, a state's long-arm statute will simply extend its jurisdiction to the bounds of the Due Process Clause. *See, e.g., Daimler*, 571 U.S. at 125 (noting that California's long-arm statute is coextensive with the bounds of the U.S. Constitution). It appears, however, that Missouri's long-arm statute requires "two separate inquiries," one under the statutory text and a second under the Constitution. *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 909 (8th Cir. 2012) (citing *Bryant v. Smith Interior Design Grp., Inc.*, 310 S.W.3d 227, 231 (Mo. 2010)).[6] The court thus discusses each separately.

---

[6]      The court acknowledges that the distinction between analyzing personal jurisdiction under Missouri's long-arm statute and the Due Process Clause is far from clear. The Eighth Circuit cited the Missouri Supreme Court's decision in *Bryant* as counseling separate inquiries under Missouri's long-arm statute and due process. Indeed, *Bryant* conducted separate inquiries—but also stated that Missouri's long-arm statute "is construed 'to extend the jurisdiction of the courts of this state over nonresident defendants to that extent permissible under the Due Process clause.'" 310 S.W.3d at 232 (quoting *State ex rel. Deere & Co. v. Pinnell*, 454 S.W.2d 889, 892 (Mo. en banc 1970)). Because of this lack of clarity, the court addresses due process below, even though it finds that Missouri's long-arm statute does not reach Mead.

### 1.    Missouri's Long-Arm Statute

Missouri's long-arm statute subjects a defendant to its jurisdiction "as to any cause of action arising from," among other things, "[t]he transaction of any business within th[e] state" or "[t]he commission of a tortious act within th[e] state." Mo. Ann. Stat. § 506.500.  Then, beyond in-state business or tortious activity, Missouri courts also extend their reach to "*extraterritorial* acts of negligence producing actionable consequences in Missouri." *State ex rel. William Ranni Assocs., Inc. v. Hartenbach*, 742 S.W.2d 134, 139 (Mo. 1987) (emphasis added).  Missouri's long-arm statute thus reaches a defendant's tortious conduct either in or outside the state, as long as (at least for out-of-state conduct) it produces "actionable consequences" within the state.  And produce it must; the terms "arising from" and "producing actionable consequences" both imply causality—a conclusion consistent with the Supreme Court's interpretation of the same language as it appears in the due-process context. *See Ford*, 141 S. Ct. at 1026 (noting that the "arise out of" standard "asks about causation," showing "that the plaintiff's claim came about because of the defendant's in-state conduct").

As to in-state contacts, Mead Johnson does not dispute the fact that it does business in Missouri.  (*See* Mead Johnson's Reply in Supp. of their Mot. to Dismiss Pl.'s First Am. Compl. (hereinafter "Defs.' MTD Reply") [23] at 5.)  Instead, it avers that Plaintiffs' injuries simply were not caused by those Missouri contacts and thus did not "aris[e] from" Defendants' business there. (Defs.' MTD at 9.)

The court agrees.  As noted in the court's prior order, "R.J. was born in Kansas, was fed Mead Johnson's allegedly injurious product in Kansas, and was diagnosed with NEC in Kansas." (Mem. Op. and Ord. at 8.)  Mead Johnson's activities in Missouri—its sale and advertisement of Enfamil, its registration with the Missouri Secretary of State, and its participation in WIC—do not bear on Plaintiffs' injuries such that these injuries could be said to arise out of Mead's Missouri business contacts.

Without some glue tying Plaintiffs' harm to Mead's business in Missouri, this avenue to personal jurisdiction under Missouri's long-arm statute comes up short. Plaintiffs never allege, for example, that Mead's activities in Missouri somehow brought about R.J.'s NEC and its concomitant harm. For example, Plaintiffs do not allege that Mead's advertisements enticed Ms. Donaldson to request Enfamil at Overland—indeed, it appears that Kansas doctors made the decision to use Enfamil with no input from Ms. Donaldson. (*See* Am. Compl. ¶¶ 35–36.) Nor do Plaintiffs allege that Mead's Missouri-based advertisements influenced those doctors' decisions regarding Enfamil's use. (*See id.*)

Nor did Mead's *out-of-state* activity cause "actionable consequences" within Missouri, at least within the meaning of its long-arm statute. The "mere fact" that a Missouri resident is injured "as a result of out-of-state activities is not, by itself, enough to meet the requirements of Missouri's long-arm statute." *Naegler v. Nissan Motor Co.*, 835 F. Supp. 1152, 1155 (W.D. Mo. 1993) (refusing to find specific jurisdiction under Missouri's long-arm statute where Missouri resident was injured in vehicular collision out-of-state, "[e]ven . . . assum[ing]" that the defendant had established otherwise sufficient contacts in Missouri).

Instead, the Missouri caselaw on which Plaintiffs rely suggests that for a defendant's out-of-state activities to render it subject to the long-arm statute, the plaintiff's injury must occur within the forum state. For example, Plaintiffs point to *Noble v. Shawnee Gun Shop*, in which a Missouri court exercised jurisdiction over a *Kansas* gun store near the Missouri border that advertised in Missouri and sold a gun used to shoot a Missouri resident in Missouri. 316 S.W.3d 364, 372–73 (Mo. Ct. App. 2010). In finding that the gun's negligent sale in Kansas could constitute a "tortious act within this state" subject to the statute's reach, the court stressed both the shop's advertisements and "encourage[ments]" to Missouri residents, and also the fact that its products were used to kill someone in Missouri. *Id.* at 372–73. To the court, the fact that the murder occurred in Missouri constituted foreseeable "actionable consequences" there, especially given the shop's close proximity to the Missouri border. *See id.* at 371. Another case Plaintiffs cite,

15

*Thurman v. Am. Honda Motor Co., Inc.*, reached the same result where a Missouri resident was injured in a car crash in Missouri by a car manufactured elsewhere but marketed in Missouri; the court repeatedly noted that the injury had occurred in Missouri. No. 22-CV-04007-WJE, 2022 WL 4292331, at *2 (W.D. Mo. Sept. 16, 2022). So too in *Myers*, where two individuals followed a Missouri resident home from an Illinois casino, beat him, and stole the winnings he had brought with him. 689 F.3d at 908–11. The Eighth Circuit pointed out that the casino advertised to Missouri residents and offered protection to customers who won large sums of money, including by accompanying them home (though, unfortunately, not in the plaintiff's case); the Eighth Circuit concluded the casino could foresee that its "actions could have consequences felt in Missouri." *Id.* at 911.

In all of these cases, the foreseeable and relevant "actionable consequences" of the defendant's out-of-state conduct involved the actual *injury* occurring in the forum state. Plaintiff cites no case in which a Missouri resident was injured in another state by tortious conduct in that other state, only to return to Missouri and sue the defendant there. To go that far would unduly stretch the already "general language" courts have used to fit cases like *Noble* and *Myers* within the ambit of Missouri's statute. *Naegler*, 835 F. Supp at 1155.

Plaintiffs' injuries did not arise out of Mead's contacts with Missouri, nor did Mead's out-of-state activities cause "actionable consequences" in Missouri. The injury occurred in Kansas. For these reasons, Missouri's long-arm statute does not confer specific jurisdiction over them.

### 2. Due Process

To the extent the inquiries are distinct, it is worth noting that Missouri's exercise of personal jurisdiction over Mead may not be consistent with due process. To satisfy due process, the defendant must, first, have "purposefully avail[ed] itself of the privilege of conducting activities within the forum State . . . ." *Ford*, 141 S. Ct. at 1024 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Second, the plaintiff's claims "must 'aris[e] out of or relate to the defendant's contacts'" with the forum state. *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cty.*, 582 U.S.

255, 262 (2017) (quoting *Daimler*, 571 U.S. at 127).  Finally, "any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice."  *NBA Props., Inc. v. HANWJH*, 46 F.4th 614, 623 (7th Cir. 2022) (quoting *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 398 (7th Cir. 2020)).

The first requirement is easily met.  Mead does not meaningfully dispute that Defendants purposefully availed themselves of conducting business in Missouri, and Defendants' contacts with Missouri—registering to do business there, their exclusive WIC contract, and their sales of Enfamil there—show active pursuit of its market for the same product that injured Plaintiffs.

What is less clear is whether Plaintiffs' injuries arise out of or relate to Mead's connections with Missouri.  A "strict causal relationship" is not necessary for the exercise of specific jurisdiction to satisfy due process.  *Ford*, 141 S. Ct. at 1026.  Due process requires only that plaintiff's claims "relate to" the defendant's contacts with the forum state; they need not "arise out of" them.  *Id.* Still, the "relate to" standard "incorporates real limits, as it must to adequately protect defendants foreign to a forum."  *Id.*  Two recent Supreme Court cases offer guidance on this issue.  In *Bristol-Myers*, the Court found that California could not exercise specific jurisdiction over claims against the pharmaceutical company brought by out-of-state plaintiffs who had been injured outside the state, simply because the company sold the exact same offending drug in California as well.  582 U.S. at 265 (noting the "weak[]" connection between the claims and the forum given that "[t]he relevant plaintiffs are not California residents and do not claim to have suffered harm in that State.")  By contrast, in *Ford*, the Court held that Ford was subject to specific jurisdiction in states where resident plaintiffs were injured or killed in the forum state by Ford's defective cars, which Ford marketed and sold there, despite the fact that the particular cars plaintiffs had been driving were purchased in another state.  141 S. Ct. at 1029–30.  Unlike the plaintiffs in *Ford*, the *Bristol-Myers* plaintiffs "[were] residents of the forum States.  They used the allegedly defective products in the forum States.  And they suffered injuries when those products malfunctioned in the forum States."  *Id.* at 1031.

17

Plaintiffs argue that Mead's "significant presence . . . through the WIC program created a high likelihood that Ms. Donaldson, as both an expectant mother and WIC recipient, was exposed to Defendants' marketing regarding the safety and efficacy of their infant formula products."[7] (Pl.'s Resp. – MTD at 10–11 (citing Am. Compl. ¶¶ 10–11).) They also stress that Mead sold Enfamil, the product that injured R.J., throughout Missouri, and that Mead's presence there, paired with the fact that Plaintiffs are residents, "giv[es] the state an interest in resolving the dispute . . . ." (Pl.'s Resp. – MTD at 11.) Finally, Plaintiffs argue that it would be convenient for both parties to litigate in Missouri. (*Id.*) The circumstances here thus fall somewhere between *Ford* and *Bristol-Myers*: Unlike in *Ford*, Plaintiffs' injuries did not occur in the forum state, but unlike in *Bristol-Myers*, the Plaintiffs are forum-state residents.

The court concludes that the argument for Missouri's exercise of jurisdiction faces significant hurdles. Any potential "likelihood" that Ms. Donaldson was exposed to advertisements for Enfamil does not connect her injuries to Mead's Missouri contacts, given that the decision to use the Mead product was made by Kansas doctors without Ms. Donaldson's input. (*Id.* ¶¶ 35–36.) In other words, because Ms. Donaldson had no say in the medication decision, Mead's marketing in Missouri did not increase the likelihood of R.J.'s injury. Apart from the fact that Mead sells the same product in Missouri, there is no obvious connection between Mead's Missouri contacts and Plaintiffs' injuries. Nor is this gap filled by other circumstances as, for example, in *Ford*, where the plaintiff's injury had occurred in the forum state. The injury here occurred in Kansas, where R.J. developed NEC and was treated for months before returning to Missouri.

Recent case law is instructive. In *Wallace v. Yamaha Motors Corp, U.S.A.*, No. 19-2459, 2022 WL 61430 (4th Cir. Jan. 6, 2022), the plaintiff, a South Carolina resident, bought an allegedly

---

[7] Plaintiffs assert in their response brief that Ms. Donaldson was enrolled in the WIC program (Pl.'s Resp. – MTD at 10–11 (citing Am. Compl. ¶¶ 10–11)), but the Amended Complaint contains no such allegation. (*See id.*) Nor is it clear that her participation in Missouri's WIC program would change the specific-jurisdiction analysis; the injury here occurred and was caused by doctors administering the formula in Kansas, not as a function of the Missouri WIC program.

defective motorcycle in Kansas and suffered injury in Florida, but the defendant regularly sold the same allegedly defective motorcycle model in South Carolina.  *Id.* at *4–5.  Affirming dismissal of the case for lack of jurisdiction in South Carolina, the court observed that "specific jurisdiction is not simply a lower standard for general jurisdiction, and Wallace offers no facts to connect her specific claims to Yamaha's actions in South Carolina."  *Id.* at *4.  Instead, "it is the relationship between [defendant]'s activities and [plaintiff]'s claims, not the volume of [defendant]'s activities, that matters" in the calculus.  *Wallace*, 2022 WL 61430, at *5 n.6.  A federal court in Maryland reached the same conclusion under similar facts, finding that, "in accordance with *Ford* . . . the injury must take place in the forum state" and refusing to "find that specific jurisdiction exists in a particular forum state simply because a party provides products and services within that state."  *Toombs v. Lowe's Home Ctrs., LLC*, No. GLS-22-2244, 2023 WL 4593372, at *6–7 (D. Md. July 18, 2023).

The court is thus skeptical that Missouri's exercise of specific personal jurisdiction in this context would comport with due process.  As explained earlier, however, it need not decide the issue because Missouri's long-arm statute does not extend to Mead.  Mead is thus not subject to personal jurisdiction in Missouri for purposes of Plaintiffs' suit.

## III.   Next Steps

The parties disagree as to the appropriate next steps: Plaintiffs ask that this court retain the case until the conclusion of pretrial proceedings, even if Missouri lacks jurisdiction over Defendants; Defendants ask the court to either transfer the case to Kansas or dismiss it and allow Plaintiffs to refile.  After reviewing the parties' briefing on the matter, the court concludes that the best course is to dismiss Plaintiffs' case and allow Plaintiffs to refile, either in Kansas or directly in the Northern District of Illinois.

The MDL statute places all pretrial transfer actions explicitly and exclusively in the JPML's hands, stating that "[e]ach action [comprising the MDL] shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred

unless it shall have been previously terminated . . . ."  28 U.S.C. § 1407(a); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 40–41 (1998).  Accordingly, while a district court could normally transfer a case to cure venue defects under 28 U.S.C. § 1404(a), transferee courts in MDLs lack this power.  *Lexecon*, 523 U.S. at 41 n.4 (noting that "the statutory language of § 1407 precludes a transferee court from granting any § 1404(a) motion").

As a transferee court, then, this court cannot take the typical approach of simply transferring the case to a proper venue.  Instead, as far as the court can tell, there are two possible options for rectifying the case's jurisdictional defects.  First, the court could ask the JPML to remand Plaintiffs' case to Missouri and instruct the Missouri court to transfer it to Kansas.  *See Kalama v. Matson Nav. Co., Inc.*, 875 F.3d 297, 308–09 (6th Cir. 2017) (noting that "[t]his approach is allowed," citing *Lexecon*, 523 U.S. at 39).  Second, the court could simply dismiss the action under 28 U.S.C. § 1406 with the expectation that Plaintiffs refile it, either in Kansas (presumably leading to a "tag-along" order) or directly in this court.

The latter option is the most convenient.  Pursuant to the court's recent Case Management Order, the Plaintiffs may refile directly in the Northern District of Illinois, listing Kansas as the proper venue for remand (such that the case would be deemed filed in Kansas).  (*See* Case Management Order No. 11 ([296] in Case No. 22 C 71 (Jan. 6, 2023)).  This is a far less circuitous path back to the MDL than one involving the JPML.  Nor will dismissal work any injustice to Plaintiffs.  As Defendants point out, if Plaintiffs refile within six months, Kansas law mandates treating their claims as though they had originally been filed there, meaning that Plaintiffs' claims would not be time-barred.   (*See* Kans. Stat. Ann. § 60-518; Defs. Mead Johnson & Co., LLC, and Mead Johnson Nutrition Co.'s Brief Regarding Procedural Next Steps at 4.)  To cure any doubt on this score, the court would expect Defendants to stipulate to waiver of any statute-of-

limitations defenses stemming from this dismissal and Plaintiffs' refiling within an agreed time frame.[8]

## CONCLUSION

Defendants' motion to reconsider [29] is granted. Plaintiffs' case is dismissed without prejudice to refiling as described in this order.

ENTER:

Dated: December 8, 2023

_____
REBECCA R. PALLMEYER
United States District Judge

---

[8] The Defendants raise a potential third option in their briefs: that instead of dismissal or request for remand, the court can—or even must—transfer the case pursuant to 28 U.S.C. § 1631. That statute provides that when a case is filed in a court and "that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court" to cure the jurisdictional defect. 28 U.S.C. § 1631.

The court declines to adopt this approach. First, it is not clear that it is necessary "in the interest of justice." Second, section 1631 applies to the court in which a case was filed—not, as here, an MDL transferee court. *See* 28 U.S.C. § 1631 (limiting the statute to "a civil action . . . filed in a court" where "*that* court finds that there is a want of jurisdiction" (emphasis added)). Third, the language of section 1407 implies a limitation on transferee courts' ability to transfer MDL cases under section 1404(a), and perhaps under section 1631 as well. *See, e.g., Shah v. Pan Am. World Servs., Inc.*, 148 F.3d 84, 91 (2d Cir. 1998) ("In short, *Lexecon* and § 1407 require that the MDL panel remand to the transferor court . . . and any further transfers of venue for trial under any statute must follow such remand.") (emphasis added). Other transferee courts to confront this question have reached this conclusion. *See, e.g., In re Nat'l Collegiate Athletic Assoc. Student-Athlete Concussion Injury Litig.*, No. 16 CV 8727, MDL No. 2492, 2023 WL 6461232, at **6–7 (N.D. Ill. Oct. 4, 2023); *In re Camp Lejeune North Carolina Water Contamination Litig.*, 263 F. Supp. 3d 1318, 1334–35 (N.D. Ga. 2016); *In re Chiquita Brands Int'l, Inc. Alien Tort Statute and Shareholder Derivative Litig.*, 190 F. Supp. 3d 1100, 1123 (S.D. Fla. 2016).